# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| KAYLA WALKER, and | § | |
| DAVID CONKLIN | § | |
|       Plaintiffs, | § | |
| | § | |
| V. | § | **Case 3:22-CV-01164-X** |
| | § | |
| CITY OF RICHARDSON, TEXAS; | § | |
| GARY TITTLE, CHIEF OF POLICE; | § | |
| JAMIE GERHART, CAPTAIN; | § | |
| JAMES HOLLEY, LIEUTENANT | § | |
| MICHAEL FITZSIMMONS, SERGEANT; | § | |
| AND CHAD SWIERE, SERGEANT | § | |
|       DEFENDANTS. | § | |

## PLAINTIFF KAYLA WALKER AND DAVID CONKLIN'S
## FIRST AMENDED FEDERAL COMPLAINT

Respectfully submitted,

*/s/ Eric N. Roberson*

_____

Eric N. Roberson
State Bar No. 00792803
ENR@kilgorelaw.com
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75204
(214) 379-0817
(214) 379-0843 (telecopy)
**ATTORNEY FOR PLAINTIFFS**
**KAYLA WALKER AND DAVID CONKLIN**

## TABLE OF CONTENTS

I.      **The Parties** ..................................................................................................... 1

II.     **Jurisdiction, Venue, and Permissive Joinder of Independent Claims** ....................... 3

III.    **Factual Background** .......................................................................... 3

     A.      **Defendants Use an Illegal Ticket Quota Policy By Requiring
Police Officers to Write Tickets at or Above Sector Average**........................... 5

     B.      **Walker Complains of the Illegal Ticket Quota Practice to the City Council
and the Practice Becomes Subject to Immense Press Scrutiny, including
Media Statements by Conklin** .......................................................... 11

     C.      **Richardson Hires Outside Law Firm to Conduct Investigation,
Which Confirms Illegal Ticket Policy, Yet Publicly Denies the Illegality
of the Illegal Policy that it Had Just Documented** ............................................ 13

     D.      **Richardson Falsely Claims Exoneration and Claims to Clarify Practices,
Yet Illegal Practice Remains, Weekly Stat Sheets "Productivity"
Discipline Are Still Used to Create an Illegal Quota that Violates
Section 720.002** .................................................................................. 17

     E.      **Dallas - Fort Worth Police Officers Trapped by Region-Wide
Transfer Policies** ................................................................................... 19

     F.      **Defendants Engage in Post-Speech Retaliation Against Walker and
Conklin Including the Beginning of Ghosting Plaintiffs' as
Manifest Retaliation for Breaking the Blue Wall of Silence** .......................... 20

     G.      **The Defendants Have Engaged in a Pattern and Process that
Has Constructively Discharged Plaintiffs by "Serpico-ing" Them** ............... 28

     H.      **Having Been Serpico-ed, and in Fear for Their Safety While at
Work, Plaintiffs Request the Protection of a Joint Assignment and Seek
the Assistance of a Counselor, and Take Long-Term FMLA Leave When
this Request is Denied** .......................................................................... 34

IV.     **Legal Foundation** ............................................................................. 38

     A.      **The First Amendment Protects Speech by Public Employees on
Matters of Public Concern** ................................................................. 38

        1)   **It is Clearly Established in the Fifth Circuit that Public Employees
Cannot Be Retaliated Against Based on Speech Regarding a Matter of
Public Concern** .................................................................................. 41

    2)   The Fifth Circuit Routinely Denies Qualified Immunity When a Public Employee Claims to Have Suffered Retaliation Due to Protected Speech  ... 42

    B.    The Texas Whistleblower Act ........................................................................ 46

    C.    Walker and Conklin Both Suffered Adverse Employment Actions, Including by Harassment, the Requirement for Unpaid FMLA Leave, and Their Impending Constructive Discharge ................................. 48

    D.    The Use of Mandamus and/or the Declaratory Judgment Act is Permissible to Stop Ultra Vires Actions of Government Employees ........... 50

V.    Causes Of Action: ....................................................................................... 54

    A.    Count One: by Both Plaintiffs, Against the Individual Defendants, Under 42 U.S.C. Section 1983 for Unlawful Retaliation in Violation of the First Amendment of the United States Constitution ................................. 54

    B.    Count Two: Retaliation in Violation of the Texas Whistleblower Act by Plaintiff Walker Against Defendant City of Richardson .............................. 54

    C.    Count Three: By Both Plaintiffs Against the Individual Defendants Requesting Equitable Relief against the Individual Defendants Either Via Mandamus and/or under the Declaratory Judgment Act ........................................................................ 55

VI.    Prayer ...................................................................................................... 56

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KAYLA WALKER, and | § | |
| DAVID CONKLIN | § | |
|        Plaintiffs, | § | |
| | § | |
| V. | § | Case 3:22-CV-01164-X |
| | § | |
| CITY OF RICHARDSON, TEXAS; | § | |
| GARY TITTLE, CHIEF OF POLICE; | § | |
| JAMIE GERHART, CAPTAIN; | § | |
| JAMES HOLLEY, LIEUTENANT | § | |
| MICHAEL FITZSIMMONS, SERGEANT; | § | |
| AND CHAD SWIERE, SERGEANT | § | |
|        DEFENDANTS. | § | |

PLAINTIFF KAYLA WALKER AND DAVID CONKLIN'S
FIRST AMENDED FEDERAL COMPLAINT

Plaintiffs Kayla Walker (Walker) and David Conklin (Conklin), (collectively "Plaintiffs")
file this their First Amended Federal Complaint against Defendant City of Richardson, Texas
(the "City"), Gary Tittle, Chief of Police; Jamie Gerhart, Captain; James Holley, Lieutenant;
Michael Fitzsimmons, Sergeant; and Chad Swiere, Sergeant; and would show as follows:

I.    **The Parties**

1.    Plaintiffs are individual residents of Texas. Walker resides in McKinney, Texas
and Conklin resides in McKinney, Texas. Each is a police officer in the City of Richardson
Police Department.

2.    The City of Richardson is a municipality and subdivision of the State of Texas. It
has been served and has answered.

3.    Gary Tittle, Chief of Police; Jamie Gerhart, Captain; James Holley, Lieutenant;
Michael Fitzsimmons, Sergeant; and Chad Swiere, Sergeant; (collectively the Individual

Defendants). Each is sued in their individual capacity only. Each is sued under Section 1983 for acting under color of law. Each is sued under Section 1983 for acting under Color of Law. Each of the Individual Defendants resides in Texas and works at the City of Richardson Police Department. They are each sued in their individual capacity. Each has been served formally or accepted service through counsel. Each has answered.

## II.    Jurisdiction, Venue, and Permissive Joinder of Independent Claims

4.      This matter was originally filed in State District Court in Dallas County, Texas, 44th Judicial District. The 44th District Court had proper jurisdiction because the relief that the Plaintiffs sought was within the jurisdictional limits of that Court. The matter was properly removed to this Court because the Plaintiffs seek, *inter alia*, relief under the First Amendment as enforced through 42 U.S.C. Section 1983, and this Court has supplemental jurisdiction over the Plaintiffs' state law claims.

5.      Venue was proper under Section 544.007(b) of the Texas Government Code, regarding venue in Texas Whistleblower Act cases, because the City of Richardson is within Dallas County, where the events in question occurred. Venue is proper in this District and Division because it is the U.S. District Court and Division embracing Dallas County, Texas, where the matter was properly filed. 28 U.S.C.A. § 1441(a).

6.      This Action consists of five separate and independent claims under three causes of action by two Plaintiffs against multiple Defendants. Plaintiff Walker brings all three causes of action, and Conklin brings two causes of action. These Plaintiffs and Defendants are properly joined as parties under Rule 20 of the Federal Rules of Civil Procedures, the federal rule for permissive joinder of separate plaintiffs and defendants. As to Causes of action, these are properly joined under Rule 18 of the Rules of Civil Procedure despite each of the three causes of

action in the five claims brought against them being independent claims. Two of the causes of action by both Plaintiffs are filed against the Individual Defendants and one of the causes of action by Conklin is filed against the City of Richardson. Despite these three divergent claims, Defendant in each of these three matters are properly joined together under Rule 18 of the Federal Rules of Civil Procedure. Specifically, the City of Richardson is a Defendant solely as to Plaintiff Walker's claim under the Texas Whistleblower Act. The City of Richardson cannot be sued under the Plaintiffs' First Amendment claim because the City Council has not authorized the alleged violations of the First Amendment. The City of Richardson cannot be sued under the Declaratory Judgment Act because of the doctrine of Sovereign Immunity bars such an action and because the *Ultra Vires* Exception to sovereign immunity applies to individual governmental employees acting in an ultra vires manner but does not apply to their municipal employer. None of the Individual Defendant are named under the Texas Whistleblower Act (TWA) claim because that claim requires the Defendant to be the employer and the TWA does not have managerial liability. Each Individual Defendant is properly a defendant under the Declaratory Judgment Act Claim because each is alleged to be conducting *ultra vires* conduct under the color of law. Each is sued under the First Amendment claim because they are participating in the retaliation against Defendants for protected speech under color of law.

III.     **Factual Background**

7.     America currently has almost 700,000 uniformed police officers. Every day these men and women put on a uniform and place their lives at risk so that we all can live in peace and tranquility. Considering these officers have volunteered to place their lives on the line for our safety, each of these officers deserves the ability to work where the law is followed, where the constitution is honored, and where they are supported by the best leadership and training

available. Unfortunately, although this aspiration is more real now than ever, this aspiration remains far from a reality.

8.      Officer Frank Serpico of the New York Police Department is well known for being one of the most famous police whistleblowers in American history. A plain-clothes vice-detective in the late 60's and early 70's. According to testimony he later provided the New York Police Department, he started internally reporting rampant police corruption in 1967. However, the political and leadership authority within the NYPD did nothing. So, in 1970, he contributed to a New York Times article on corruption within the NYPD. Shortly thereafter, on February 3, 1971, Officer Serpico was shot while on duty under circumstances that led him to believe that his fellow officers had led him into an ambush and left him without backup so he would be killed.

9.      Officer Serpico's story was made famous by the Peter Maas book and the 1973 Al Pacino movie, both entitled "Serpico." After the New York Times' stories on corruption, the then Mayor of New York, John Lindsay, appointed a 5-member commission known as the Knapp Commission to investigate police corruption. Before that Commission in October of 1971, Serpico testified: "The problem is that the atmosphere does not yet exist in which honest police officers can act without fear of ridicule or reprisal from fellow officers."

10.      Policing in America has improved greatly since 1971 (and thank goodness there has never been a case like Frank Serpico's in Texas), the fact remains that often there exists a "blue wall of silence" within police departments, and under this informal and illegal culture, police officers that provide more loyalty to the law, to the constitution, to integrity, or to transparency, remain subject to illegal reprisals and unlawful retaliation. Unfortunately, such has been the case for City of Richardson Police Officers Kayla Walker and David Conklin. Each has been ridiculed and cast out of the Richardson Police Department through the coordinated activity

of the Command Staff, including the Individual Defendants and through the actions of the Richardson Police Department's Fraternal Order of Police Lodge # 105 (Union).  Aside from Chief Tittle, each of the Individual Defendants is a member of the Union, and Lieutenant Holley is the Union Local's immediate ex-President.

11.     Indeed, although they have not been shot in the back during a drug bust, their lives have been placed in jeopardy by the misconduct of the Individual Defendants and the City, who have "Serpico-ed" the officers by taking actions to ghost them and make them "non-persons" on the for

12.     Officer Walker and Officer Conklin have been police officers with the City of Richardson since 2008 and 2011. Neither ever wanted to be a whistleblower. However, both have consistently refused to take part in an illegal ticket quota that has been occurring within the Richardson Police Department since before they joined it. As more fully described below, since Officers Walker and Conklin publicly reported the illegal ticket quota to the Richardson City Council, local media sources, the Texas Attorney General, the Texas Rangers, and the Dallas County District Attorney's Office, their ability to continue working at the Richardson Police because of increasing harassment, unlawful retaliation, and the failure of the Richardson Police and its leadership to follow the laws that they are sworn to enforce.

### A.     Defendants Use an Illegal Ticket Quota Policy By Requiring Police Officers to Write Tickets at or Above Sector Average

13.     The City of Richardson's Chief of Police until June of 2021was Jimmy Spivey, who ended his 50-year police career through retirement in May of 2021. The current chief of police is Gary Tittle who began in this role in June of 2021. During the timeframe of Chief Spivey's leadership, there was an unwritten but well-known policy that constituted a ticket quota in violation of the Texas Transportation Code Section 720.002.

14.     The gravamen of this policy was that Richardson police officers were required to be at or above the departmental or sector averages in their traffic ticket writing. Failure to maintain an "average" number of tickets would result in disciplinary action, including poor evaluations that would lead to immediate negative working conditions and that could lead to termination for cause.

15.     This policy was not just well known, over the years it cost the RPD significant resources in lost officers. For example, attached as Exhibit 1, is a listing of 26 current and former RPD officers whose identities have been redacted to protect their rights to privacy. As this exhibit shows, several former RPD officers have left the RPD because of the unlawful ticket quota policy, and many current and former officers are expected testify under oath as to the existence of the RPD's ticket quota policy.

16.     To enforce this policy, and certain points within a month, shift commanders would instruct officers that their number of tickets in a month or specified timeframe was below sector, shift, or department average and that to avoid discipline, the officer would be required to bring the number of tickets written to above either a specified number or up to the sector average.

17.     This policy was not limited to traffic citations. On a monthly basis, under Chief Spivey, for years Richardson Police officers were judged against their peers by the average number of traffic citations and the average number of arrests. Indeed, for years officers have been judged by the number of tickets written and arrests made. The gravamen is that "productivity" is measured in the number of arrests and the number of tickets.

18.     Indeed, the Police Department has even engaged in one or more mandatory arrest raids where all persons are to be arrested whether or not their arrest is constitutional. In 2016,

Officer Conklin was reprimanded for failing to arrest multiple persons at such an event despite the fact that it was unreasonable under the circumstances to arrest the person in question.

19.     To enforce this sector average quota policy, the RPD had a simple and effective system that occurs in plain sight. Weekly Stat Sheets are printed out and posted within RPD to show officers if they are below average and need to increase their ticket writing or face discipline. Attached as Exhibit 2 is a series of documents commonly known as "Stat Sheets." These Stat Sheets are the method and means in which the illegal quota policy is effectively implemented and has been for years.

20.     For each shift, each officer is provided his or her month-to-date statistics for traffic stops and tickets, as well as for arrests and several other categories. For each shift, the total number of traffic stops and traffic citations written were calculated on the "Totals" line and "Totals w/o K9 lines." Thus, for years these Stat Sheets provided officers on each shift a weekly tally of their current month-to-date numbers, the specific numbers of each of their peers, and the shift average.

21.     Attached as Exhibit 3 is a document labeled "Citation Offense Count by Officer by Result" that covers the month of November 2020. This document is the result of a new state law that was passed after the death of Sandra Bland in a South Texas County jail cell after her arrest, which was triggered by a traffic stop originally for a warning. This new reporting law required police departments to monitor all traffic stops and document both warnings and citations. This document showed that there were more stops being conducted for warnings than the command staff had previously understood. It incensed the command staff that 21 officers had written more warnings than citations. Therefore, a new policy was laid down: RPD officers were

no longer allowed to write more warnings than citations, and RPD officers who did so would be disciplined.

22.    Attached as Exhibit 4 is a document written shortly after the COVID pandemic began. The document requires officers to return to pre-pandemic ticket writing numbers. Worse, the document shows that the RPD was fully aware that the reasons that the number of tickets being written was lower during the COVID pandemic was because the amount of traffic had been greatly reduced. Even so, the Exhibit makes it clear that RPD officers were supposed to get their ticket writing numbers up to pre-Pandemic numbers – OR ELSE!

23.    Further, this numbers-based strategy, as often criticized by policing experts because it produces poor quality policing and often incentivizes illegal results. For example, in 2016 Officer Conklin responded to an incident in which multiple parties were involved. While there, Conklin's supervisors instructed him to arrest all persons at the building where the incident occurred. It should not need to be stated, but it is obviously unconstitutional to arrest persons without probable cause of committing a crime merely because the person was innocently present or nearby when third parties committed a crime. Recognizing the illegality and potential unconstitutionality of the "arrest everybody" order that he had been given, Conklin only arrested the persons whom he could lawfully arrest and/or for whom he believed in the exercise of the discretion he reasonably believed he possessed based on prior policy and. This attempted reprimand and related documentation are attached as Exhibit 5.

24.    During this period while Chief Spivey was the Chief of Police, Officer Walker received a written warning from her supervisor that stated her 28 traffic stops for one month and 35 for another were "below shift average for traffic management." Indeed, her employment file

contains many such references or requirements to reach specific numbers related to departmental or sector averages in order to not receive a negative evaluation.

25. This "sector average" policy's requirement that officers must be at, or above average created an ever-increasing *de facto* ticket quota. The policy is a quota where the number of tickets required to not receive a negative evaluation is the moving target of "sector average" because being below average resulted in disciplinary action. The policy also creates an ever-increasing *de facto* quota due to the simple function of mathematical law of averages. Officers who write less tickets are forced up to move up to average, then the number that is "average" necessarily increases. Accordingly, the resulting "quota creep" amounted to a policy whereby the quota was set as the "average" and the average was always increasing. This quota creep was effectively enforced by posting the weekly sector average through State Sheets. Every week RPD officers knew whether they were above or below average and how many tickets they had to write to get up to average.

26. Even more, the Richardson Police Department refuses to follow modern or up-to-date criminal law practices to improve public safety. For example, when officers are warned to "write more tickets" and make "more arrests," there is rarely any reference to readily available insurance data or police reports showing where there may have been an increase in accidents caused by speeding or red light running, there is no data on an increase in property thefts, house break-ins, or other crimes. No, there is the discussion of "productivity" and the instruction to "write more tickets" and "make more arrests."

27. Indeed, although there is on a few rare occasions a discussion of statistics that show increases in crime in certain areas, these statistics are almost exclusively discussed among senior officers and are not shared with patrol officers. There has never been an instruction to

officers in the field that the increase in tickets or arrests should come in any organized effort to impact these hot spots or improve public safety in any identified area or means.

28.     In contrast, patrol officers are constantly subjected to their number of arrests, stops and citations being printed in a hero sheet that are posted weekly to show officers what the current averages are that they are supposed to reach. Worse, following the new legislation that required officers to document all warnings, when the amount of officer warnings was made known to command staff, officers were warned for writing too many warnings and not enough citations. Further, officers who were in the bottom five of total "productivity" would be placed on a corrective action plan.

29.     In 2021, the illegal quota activity got to the point where Officer Walker could no longer stand it.

30.     On March 4, 2021, Sergeant Swiere threatened Walker with a negative employment evaluation if she did not bring her ticket writing up to average. Because this threat was being used to implement a ticket quota, it violated the Texas Transportation Code at Section 720.002.

31.     On March 12,2021, Sergeant Swiere made a similar threat to the entire sector during a sector meeting.

32.     On March 18, 2021, Walker was notified by another officer that claimed the officer was also being disciplined for alleged "productivity" issues, which this officer knew to mean a reference to the officer's ticket writing being below average.

33.     This core facts of this *de facto* quota system were actually confirmed by an internal departmental investigation, as detailed below, even if the investigation's alleged "official" results were to the contrary. Specifically, although only a limited number of patrol

officers were questioned, patrol officers who were interviewed by outside counsel in an internal City of Richardson Police Department Investigation advised investigatory counsel that they had been told by senior officers and by training officers, that if they wrote thirty to forty citations per month, they would not get spoken to about the number of citations they write.

34.     One patrol officer interviewed by outside investigatory counsel stated that he or she believed that the use of the sector averages created a monthly moving target that had to be met and, therefore, believed that the use of the average numbers created an illegal quota.

35.     Indeed, the evidence will show that for years, the RPD has been losing police officers who refuse to work in a department that requires officers to enforce an illegal quota system. For example, multiple RPD officers upon interviewing with other regional police departments when asked stated that the reason the wanting to leave RPD was because of its use of ticket quotas. At least one of these officers was told by the interviewer that he or she was also a former RPD who had left the RPD because of the interviewer did not to follow the RPD's illegal ticket policy.  Further, other former RPD officers left policing or left policing in the Dallas Fort Worth area because of the illegal ticket quota policy.

**B.     Walker Complains of the Illegal Ticket Quota Practice to the City Council and the Practice Becomes Subject to Immense Press Scrutiny, including Media Statements by Conklin**

36.     After years of attempting to stop the quota policy within the chain of command, Officer Walker could no longer remain silent. On April 2, 2021, she contacted the Texas attorney General's Office and notified it of the RPD's illegal Quota scheme. On April 6, 2021, she contacted the Texas Rangers and notified it of the RPD's illegal quota scheme.

37.     On Monday, April 19, 2021, Walker went to the Richardson City Council. Pursuant to City of Richardson City Council pattern and practice, Richardson City Council

"Work Session" meetings often start with a time for open statements from citizens and visitors. Walker used this standard practice to address the Council. The five minute and 19 second video of this portion of that council meeting is a public record maintained by the City and is publicly available at www.richardsontx.Swagit.com/04192021-1075.

38.     In Walker's speech, she outlined the activity that she asserted created an illegal ticket quota:

a.     Walker started by thanking the council for the opportunity to speak and also stated that the policy she was addressing had been a problem for her entire career at the Richardson Police Department.

b.     "The Richardson Police Department has been illegally using quotas to evaluate and discipline officers. Patrol officers are threatened with punishments for not writing enough tickets, arresting enough people, and making enough citizen contacts. The command staff does this under the guise of monthly productivity reports to compare officers to one another."

c.     Walker highlighted that ticket quotas violated Texas law, and to do so she read the Texas Transportation Code at Section 720.002 into the record.

d.     On behalf of herself and other officers, Walker stated that "We are requesting that you initiate an investigation into this issue" because officers had noticed the issue had been worsening in the last year and "had become unbearable for some officers."

e.     Walker also stated that her request was putting her career in danger because she had already been threatened about not meeting her quotas, and now she was speaking openly against the quota system.

39.     Walker's speech instantly created a media frenzy.

40.     The next day, Tuesday April 20, 2021, Walker's speech was covered by the Richardson Blogger, Mark Steger, on his blog called, "The Wheel." *See* attached Exhibit 6.

41.     On April 27, 2021, Walker contacted the Dallas County District Attorney's Office, and informed it of the RPD's illegal ticket quota, and requested it take appropriate law enforcement action.

**C.     Richardson Hires Outside Law Firm to Conduct Investigation, Which Confirms Illegal Ticket Practice, Yet Publicly Denies the Illegality of the Illegal Practice it Had Just Documented**

42.     Seventeen days later, on May 6, 2021, the Dallas Morning News watchdog reporter, Dave Lieber, covered Walker's accusations in an opinion piece entitled, "A Texas police officer publicly accuses her department of breaking the law with ticket quotas." This article is attached as Exhibit 7.

43.     As highlighted in the article, because of Walker's speech to the City Council, the City had decided to investigate of the alleged policy involved. As reported in the article, City Manager Dan Johnson stated:

> At a follow-up council meeting, City Manager Dan Johnson said: "I want to assure you [Mayor Paul Voelker], the City Council, the public, Officer Walker and the Richardson Police Department that the concerns raised regarding traffic enforcement practices and alleged violations of the state transportation code are serious matters.
>
> "It compelled my office, in coordination with the city attorney and the police chief, to initiate a thorough review. This review will involve outside legal counsel, and it will be conducted in an orderly and expeditious way."
>
> He promised to share results with the public and added that he assures everyone this is "getting our full attention."

44.     Amazingly, however, in the article Richardson Police Spokesman, Kevin Perlich impliedly criticized Walker when he told the Dallas Morning News reporter, her allegations

"were made outside of the department" and "She's obviously not following the chain of command on this."

45.     Also on May 6, 2021, on a WFAA Internet news article, both Officers Walker and Conklin were identified as speaking out against quotas and asked that the Texas Rangers conduct an investigation of the City's illegal quota policy. A true and correct copy of the Report is attached as Exhibit 8.

46.     On June 21, Attorneys Wayne Olson and Cara Leahy White released the report on the alleged investigation of Walker's allegations of an illegal ticket quota (Report). A true and correct copy of the Report is attached as Exhibit 9.

47.     The Report was a whitewash of the allegations and reached an alleged exoneration of the Police Department without ever analyzing the specific legal question raised by Walker's complaint – was the use of "averages" and the requirement of police officers to meet average ticket levels a violation of Section 720.002.

48.     As stated above, rank and file officers who sat for interviews validated that the Richardson Police Department had a *de facto* system in which they were required to move their ticket writing numbers up to the average. This system has lasted so long and been condoned so openly, that it is an official policy of the City of Richardson.

49.     For example, the Report highlighted that patrol officers had specifically testified that they had <u>been advised to write 30-40 citations a month</u> so that they would "not be spoken to about the number of citations they write, and also that one officer stated that "sector averages" were used as a "monthly moving target that had to be met" and thus constituted an illegal quota system, to avoid disciplinary action.

50.     The report also noted that several sergeants, including Walker's sergeant, used the "sector average approach" that the testifying patrol officer told the investigators was an illegal ticket quota. Accordingly, the report verified Walker's accusations that the Police Department was using an illegal quota system by requiring officers to ticket up to sector average.

51.     Indeed, in a conversation that occurred on May 26, 2021, just weeks after Walker's speech to the City Council, Walker's Sergeant Swiere told Walker, "Your stops, traffic, and total activity for this period are below your peers. We've talked about this a number of times, you know. This is the third consecutive inspection that your activity has been lower than your peers. So, I'm just making you aware of it. … I rate you against your peers on your primary activity"

52.     However, instead of directly addressing whether the "sector average system" that was used by numerous sergeants was an illegal quota under Section 720.002, the report unexplainably asserts that the "sector average" quota is not a quota merely because it is only one part of a multi-part analysis, and further that there is no evidence that any of the tickets produced by the illegal quota system are in fact "false tickets."

53.     To be clear, Section 720.002 prohibits:

(a)   A political subdivision or an agency of this state may not establish or maintain, **formally or informally**, a plan to evaluate, promote, compensate, or discipline:

> (1)  a peace officer according to the officer's issuance of a predetermined or specified number of any type or combination of types of traffic citations; or …

(b)   A political subdivision or an agency of this state may not require or suggest to a peace officer, …:
> (1)  that the peace officer is required or expected to issue a predetermined or specified number of any type or combination of types of traffic citations within a specified period; ….

(Emphasis added).

54.     There is simply nothing in Section 720.002 that prohibits quotas only when they are the sole measurement of an evaluation system or that allows quotas to be used provided, they are only single part of a multi-part evaluation system. Even so, after finding evidence of a sector average quota system requiring officers to write traffic citations above the sector average was being openly used within the Department, the report failed to validate Walker's charge and failed to find that the then current Police Department policy violated Section 720.002.

55.     This conclusion is as flawed as can be easily seen. A restaurant that sells a deadly fish dinner cannot claim it sold a "healthy" dinner because only the fish was poisonous, but the vegetables, salad, and dessert were perfectly fine. No! An airline cannot force a pilot to fly an airplane because 3 of 4 the engines pass inspection. No! In both cases the restaurant and the trucking have violated the law and face the legal consequences accordingly without respect to the fact that some of their conduct was legal. While a traffic ticket does not have the same lethality of a poison fish or a plane crash, the point is clear. Section 720.002 makes use of quotas illegal, whether formal or informal, if the quota is used for the purpose of evaluating, promoting, compensating, or disciplining a peace officer.

56.     There is simply nothing in Section 720.002 that gives a pass to using a quota system if it is only one element among many elements used for evaluating, promoting, compensating, or disciplining a peace officer who is required to follow it.

57.     Amazingly, the report never specifically states whether the "sector average system" it uncovered was an illegal quota system. However, under the terms of Section 720.002 (a)(1) and (b)(1), this type of use of departmental or sector averages, that specifically provides

officers the average of their peers and specifically informs the officer that failure to reach the peer average will result in a negative evaluation, is an illegal quota under Section 720.002.

58.    Further, footnote one of the Report lists media discussions by both Walker and Conklin and describes in part the content of Walker's and Conklin's statements to the media by highlighting that Walker was speaking about the City's illegal quota system and that Conklin had also spoken to media and confirmed that he believed the City had an illegal quota system. Accordingly, Defendants were all fully aware of the Plaintiffs' protected speech.

> **D.    Richardson Falsely Claims Exoneration and Claims to Clarify Practices, Yet Illegal Practice Remains, Weekly Stat Sheets "Productivity" Discipline Are Still Used to Create an Illegal Quota that Violates Section 720.002**

59.    The City of Richardson released the outside report to the public, and the Dallas Morning News reported on the release through a July 26, 2021, story entitled, "Investigation finds no proof of illegal ticket-writing quotas at the Richardson Police Department," which is attached as Exhibit 10.

60.    In the article, the new chief Richardson Police Department Chief Gary Tittle, is reported to have said in a prepared statement that the following actions will be taken to clarify the department's policies:

- Directing command staff to reinforce that there are no ticket quotas required in the department and that a ticket quota will not be tolerated.

- Telling officers that traffic stops are an important part of their jobs and will be used — among other measurements — to evaluate officer productivity.

- Creating a standardized productivity form for all supervisors to use when evaluating patrol officer performance.

61.    Despite the fact that the Chief Tittle instructed that there are no ticket quotas, which did produce a short term reduction in the application of the illegal ticket quota policy, because the report never stated that the use of a "sector average system" was a quota, and

because the Chief's public comments reaffirmed the use of traffic stops as a measurement of police officer productivity, this short term reduction has been quickly reversed, and comparison to sector averages, and the numerical assessment of ticket writing based on using averages as a quota, still continues.

62.     Indeed, Chief Tittles' reliance on the use of "traffic stops … among other measurements" served to improperly ratify among senior Police Department leadership the false assumption of the investigative report that an illegal quota is somehow less illegal if it is watered down with other evaluation parameters.

63.     Despite public statements from Chief Tittle claiming that this policy would stop, various shift sergeants and commanders have again started using this system of "below average" warnings for tickets to discipline and instruct police officers. Chief Tittle has been informed that his sergeants are doing so. Chief Tittle is fully aware that Richardson Police sergeants have again regressed to using this *de facto* ticket quota system, yet Chief Tittle has failed to stop the resurrected ticket quota policy.

64.     Notably, even though the Chief Tittle has said that he has made changes, the weekly Stat Sheet continues to be used with only one minor modification. Specifically, the sector average line of the Stat Sheet where the numbers of tickets were averaged has been removed. Never-the-less, the numbers of tickets written by fellow officers are posted for other officers on each shift to see. Clearly, RPD officer can do the math for themselves, and even without doing the mathematical calculations, each shift is contained on a single page and officers can quickly see if their ticket average appears at or above the sector average. This minor change in the Stat Sheets caused one officer at a shift change meeting to state words to the effect that, "oh, it is the same policy, we are just trying to sweep it under the rug."

65.      Finally, Chief Tittle's instruction to create a "standardized productivity form" will not erase the use of quotas if the departmental supervisors are not instructed that the use of any form of averaging or similar numbers requirement is a quota because Chief Tittle has made it clear that he continues to believe that productivity in the form of the number of tickets written by police officers will be used as a part of measuring officers' productivity and he continues to allow the use of  weekly Stat Sheets within each sector.

### E.      Dallas - Fort Worth Police Officers Trapped by Region-Wide Transfer Policies

66.      Given the Texas peace officer licensing system, enforced through the Texas Commission on Law Enforcement (TCOLE), if either Conklin or Walker are terminated by the City, such a termination would include a determination as to whether the officer's discharge was honorable, other than honorable, or dishonorable. Such a determination would become part of an officer's permanent record shared with other departments. Meaning that the failure of an officer to follow the illegal policy could result in that officer being permanently barred from being a peace officer in Texas.

67.      Additionally, as a matter of departmental policy most if not all of the police departments in North Texas and the Dallas-Fort Worth Metroplex, which policies are widely known within the policing community, area police departments do not routinely give seniority to laterally transferring officers who join their force from another department.

68.      Combined, that means that once police officers have obtained seniority in their current department, they are often at a significant disadvantage to seeking new employment at another department if they believe that their current department is not obeying the law. Thus, they are stuck between a rock and a hard place: a rock that retaliates against them if they report

illegal police conduct and a hard place that forces you to massive economic harm if you leave voluntarily.

> **F.** **Defendants Engage in Post-Speech Retaliation Against Walker and Conklin Including the Beginning of Ghosting Plaintiffs' as Manifest Retaliation for Breaking the Blue Wall of Silence**

69.    There is no doubt that the post-investigation use of the illegal quota system has been reduced, however, these reductions appear to solely by being made less visible and having the prior policy being swept under the rug. Indeed, the sector averaging policy has been modified, but it has not ended.

70.    Worse, however, is that Conklin and Walker have been retaliated against using the very processes outlined in the Investigative Report and Walker's statement to the City Council – a points-based evaluation system that directly impacts how officers bid for shifts and assignments.

71.    As predicted in her initial public statement to the City Council, Walker was made to pay and suffer for her speech through the use of this personal evaluation system that is easily manipulated for the purpose of negatively impacting officers who are seen as disloyal or otherwise have opposed Police department management.

72.    Shortly after media reveal, Captain Gerhart and Lieutenant Holley, have been heard talking loudly amongst coworkers saying Conklin was "full of shit," a "liar," and Holley was overheard saying, "f--- David," loudly enough for several coworkers to overhear. Command Staff have called Conklin and Walker liars continuously in front of their peers since the City Council speech.

73.     On May 26, 2022, between the time of 9:28-9:50-on tactical channel 1, a disparaging conversation occurred regarding Officer Conklin. This audio has been reserved through an open records request.

74.     On June 10, 2021, just after Walker's speech to the Richardson Police Department, Conklin responded to a report of "shots fired" at a well-known problem location. Conklin was the primary officer on scene and was debriefing the Sergeants who arrived on this call because he was the primary Officer. However, during this debriefing, Sergeant Fitzsimmons completely ignored Conklin and refused to even look at or make eye contact with Conklin. Fitzsimmons also backs away from the conversation and through his body language makes obvious he doesn't want anything to do with Conklin. This is the same day that Conklin spoke to the Texas Rangers, emailed Lance Wyatt (TMPA Attorney) asking for representation, and the same day Conklin found out about the anonymous complaint on him which based on information and belief, was Sergeant Fitzsimmons' doing. About a week later Conklin saw Sergeant Fitzsimmons and asked him why he was acting this way and he was clearly upset about Walker's open records request for the radio traffic on TAC1. Sergeant Fitzsimmons told Conklin he had nothing to speak to Conklin about. Sergeant Fitzsimmons said the request was frivolous and he wouldn't speak to Conklin personally, but if he needed something that was of a professional nature, he would answer it.

75.     On June 10, 2021, Officer Conklin had an inspection with Sergeant Cannon and was advised that he had received an "anonymous complaint" accusing Conklin of not arresting someone on a call. On information and belief, this anonymous complaint was initiated by Sergeant Fitzsimmons. An investigation/Special report was talked about being initiated for David regarding that call at the request of Captain Gerhart.

76.     Subsequently, Officer Conklin submitted open records requests for the video and audit trail of this complaint. Conklin had observed Captain Gerhart reviewing a video of his where he noticed a comment made on the audit trail that it was reviewed for a "Special Report" investigation).

77.     Officer Conklin placed an open records request relating to who had been watching Conklin's body camera footage. This uncovered the video in question in which Sergeant Fitzsimmons was documented as watching the video in the audit trail. Sergeant Fitzsimmons is not in Conklin's chain of command, he was not involved in any part of that call, and he is not in internal affairs. Thus, there is no reason Sergeant Fitzsimmons should have been watching Conklin's video.

78.     On June 10, 2021, Officer Conklin reported the illegal ticket quota system to the Texas Rangers by leaving a voice message with Texas Ranger responsible for such complaints. Specifically, Walker complained that the RPD was using an illegal quota system in violation of Texas law.

79.     On July 21, 2021- in a meeting with Officer Walker, Chief Tittle and Captain Gerhart reported to Walker that the final results of the quota investigation were a finding that there were no illegal quotas. At that meeting, Walker advised Tittle and Gerhart that she was still requesting the Texas Rangers investigate the illegal quota scheme.

80.     On September 14, 2021, Walker had her appraisal meeting with Sergeant Swiere. In this meeting, her evaluation was lowered in "self-initiated activity" and "self-awareness." Both of these items are proxies for refusing to follow the illegal ticket quota policy and speaking about the illegal ticket policy publicly.

81.     On September 15, 2021, Walker submitted her evaluation rebuttal through the chain of command to Chief Tittle.

82.     During this timeframe, Sergeant Balencia observed that Officer Conklin was helping Officer Walker on this memo to Chief Tittle, and asked him why he was doing so, and them both that those evaluations were not a "team thing."

83.     On September 21, 2021, Walker found a commendation sent to Sergeant Balencia from July 13 that was not placed in her file. Walker emailed the commendation to Balencia and copied Sergeant Swiere and Lieutenant Wolbrueck.

84.     On October 20, 2021, Conklin and Walker went above and beyond the call of duty in catching a burglar. Contrary to normal protocol for such events, no mention of this activity was mentioned at the end of shift, and no commendation ever issued.

85.     Rude interruptions, not previously suffered by Walker and Conklin are now openly tolerated. In other words, the rank-and-file officers have received the message of the Command Staff, including the Individual Defendants that because Walker and Conklin have broken the Blue Wall of Silence and spoken out against the RPD's practices, they are persona non grata, and can be treated as such by rank-and-file officers.

86.     On October 31, 2021, Sergeant Shackleford interrupted Conklin during a briefing when he spoke on others talking badly about other employees when they make mistakes - depending on who they are. Sergeant Shackleford was rude and interrupted him bluntly.

87.     On November 2, 2021, Sergeant Balencia interrupted Walker in briefing, rudely, when she mentioned ex Officer Portillo getting hired at another dept after what he did, versus people that are legitimately blacklisted by this department wrongly and can't get a job

somewhere else. Sergeant Smith agreed and said you have to do something really bad to make the department scared of you. Sergeant Balencia interrupted them.

88.     On November 2, 2021, when Officer Conklin was discussing his memo in support of obtaining the position of Acting Sergeant with Sergeant Smith, Conklin was told by Smith that people within the Department were "not liking his attitude."

89.     On or about the 1st week of January 2022, Officer Conklin was denied promotion to the position of Acting Sergeant. The interviews were conducted in the weeks prior to his denial and both Captain Gerhart and Lieutenant Holley conducted the interviews and were the decision makers in the promotion. There were five candidates who applied for this promotion, of which Officer Conklin was the most senior and the only candidate to have held this position previously. Accordingly, Conklin was the most qualified applicant. Despite having proven his abilities to serve in this capacity already for almost an entire year, Officer Conklin was denied this position.

90.     On January 4, 2022, Officer Conklin appealed Captain Gerhart and Lieutenant Holley's decision directly to Chief Tittle and submitted an internal memo via email to Chief Tittle.

91.     On February 2, 2022, Officer Conklin had a meeting with Chief Tittle and Assistant Chief Bussiere to discuss his being passed over for the promotion. In this meeting Chief Tittle told Officer Conklin the memo he submitted read like Conklin was trying to put an "HR spin" or a "legal spin" on it. Chief Tittle then added "Buddy, you got something, file it." This was a direct statement from Chief Tittle effectively asking Conklin to either shut up or file a lawsuit.

92.    During this meeting, Conklin had asked Chief Tittle if he even had a conversation with Captain Gerhart, Lieutenant Holley, or Sergeant Fitzsimmons regarding their hostile behavior towards both Conklin and Walker, and Chief Tittle said he had no conversation with anyone about them specifically. He only addressed things vaguely in leadership meetings where he talked about having compassionate accountability and giving people second chances. However, having been made aware of the conduct of these individuals, Chief Tittle decided to do nothing to alter their retaliatory behavior.

93.    On or about February 10, 2022, Officer Conklin received information that he was denied promotion to Police Training Officer which he had interviewed for on January 26, 2022. Captain Gerhart and Lieutenant Holley also lead that series of interviews. There were twenty-two total applicants for this position and only five were not selected. Conklin, knowing he was more than qualified for this position, submitted an open records request for information pertaining to the other candidates who were selected over him so he could appeal his failure to promote. This request prompted Lieutenant Holley to go to all of the employees who were the subject of the request, and he notified them all that Conklin was requesting their "personnel file". Lieutenant Holley purposefully told them about this information in a vague manner so as to cause a rift between Conklin and his peers. Officer Conklin was subsequently approached by multiple Officers who were upset about what they heard from Lieutenant Holley and Conklin was forced into a position to defend himself for simply obtaining public records.

94.    The above actions of continued and systemic harassment have had a profound and negative impact on the health and ability to work of Officers Walker and Conklin. Indeed, both have suffered severe mental anguish and emotional distress, and are nearing the inability to work at the Richardson Police Department. While both have strived to continue to serve the citizens of

Richardson, the pattern of harassment against them has the design or effect of forcing each to leave against their will.

95.     In summary, as to Walker, among other items, she has received an improper negative evaluation that negatively impacts her career immediately and puts her just a few points away from dismissal in the future. This evaluation was improperly based in whole or in part in retaliation for: (1) her filing a report of criminal conduct with the Texas Attorney General's Office, the Texas Rangers, and with the Dallas County District Attorney' Office, and (2) her exercise of her First Amendment Free Speech rights to openly and publicly oppose the illegal ticket quota (a) before the Richardson City Council; (b) through interviews and statements made and reported by media sources including the Dallas Morning News. Walker has internally appealed the review and notified Chief Tittle that the review illegally contained negative evaluations related solely to her refusal to follow the illegal quota system and in retaliation for her reporting the illegal quota system.

96.     Officers Walker and Conklin have been subjected to repeated attempts to hinder the development of their careers. They have also been subjected to repeated attacks on their reputations by supervisors. Officer Conklin has been denied for two positions for career development, to include Acting Sergeant (a position which he had previously held) and Police Training Officer, in which he was overly qualified and among the best of candidates. Officer Conklin asked for reconsideration and appealed directly to Chief Tittle with no resolve. Each of these promotions include pay increases. Each of these positions are complimentary to his current position.

97.     Officer Conklin has also received an anonymous complaint which was sent directly to the Chief of Police. This complaint had no basis or violations, but it was pursued anyway with the intent to punish Officer Conklin.

98.     Officer Conklin has been overlooked for positions, assignments, and even completely ignored on calls for service by peers and supervisors.

99.     Officers Conklin and Walker have been called liars and their credibility has been damaged by supervisors openly speaking poorly of them to their peers directly related to them speaking out about the illegal quota.

100.     Officer Walker received a reduced evaluation score due to not adhering to the illegal quota she made public statements about and vehemently opposed. She was also lowered on her evaluation for not being "self-aware" and labeled as defensive and argumentative due to defending her position. Officers Walker and Conklin have been subjected to extensive scrutiny by their peers and supervision to the point that Officer Walker was told she should leave the shift she was on for the previous eight years because she was refused to meet the illegal quota.

101.     Officer Walker was openly yelled at, criticized, and made to look like a liar in front of peers and supervisors by Richardson Police department Sergeant Swiere.

102.     Chief Tittle has repeatedly been notified by Conklin and Walker over the course of many months as to the harassment and mistreatment to which Officers Walker and Conklin are being subjected. On these occasions Chief Tittle has been asked to end the harassment, yet he has failed to take action to do so. Further, despite being informed that the illegal ticket quota system of sector averages continues, no action to stop it has been taken. Instead, Officers Walker and Conklin had been told to wipe their slates clean, as if they are the problems, or told to undergo forced mediation with those who were responsible for the damage to their careers.

G.     **The Defendants Have Engaged in a Pattern and Process that Has Constructively Discharged Plaintiffs by "Serpico-ing" Them**

103.     Prior to the filing of this action, Plaintiffs were already experiencing retaliation that rose to the level of constructive discharge. Retaliation subsequent to the filing of this matter has made it impossible for the Plaintiffs to safely perform their duties as police officers because the harassment has been at the nature and on a level so severe that each has reasonable anxiety related to their safety while on duty.

104.     Essentially, both Walker and Conklin have been "ghosted" or "Serpico-ed." Ghosting is popular term with several meanings. It is a form of harassment where someone is treated as if they no longer exist. In the Internet world of social media, it is a form of cancel culture were you unfriending someone and refusing communications with them – they are dead to you. In the world of human resources, ghosting sometimes is used to describe failing to show up for a job interview. In the world of a police department, police officers cannot be unfriended by fellow officers whom they must rely on went responding to a crime in progress, and an officer cannot show up at a "shots-fired" call from dispatch and find out that none oof his or her fellow officers decided to come to the scene of the crime. Indeed, the systematic ghosting a fellow officer is the equivalent of a constructive discharge because it treats the officer as if they are Officer Serpico, who after being ghosted by his fellow officers was shot in the back (ostensibly by the criminals) without backup during a drug bust. Accordingly, in the police world, being "ghosted" equals being "Serpico-ed," no police officer who is ghosted by his or her department leadership can consider themselves safe from harm while on duty. Accordingly, a police officer who has been "ghosted" or "Serpico-ed" has been constructively discharged.

105.     Plaintiffs filed this matter in State District Court on March 17, 2022. On March 18, 2022, the media released stories related to this action. In response, the Chief Tittle sent an

email to the entire police department about the "alleged lawsuit." Every officer and non-officer in the email chain in the Police Department. Chief Tittle called the lawsuit a "disruption."

106.    On March 19, 2022, Officer Walker received information from other officers that Assistant Chief Pewitt made a surprise appearance at evening watch patrol briefing and spoke about the "alleged" lawsuit. Pewitt advised patrol officers they have not been "served yet." He also stated there was no merit to the quota allegation – effectively calling Plaintiffs liars.

107.    On March 20, 2022, at about 4:00pm, Sergeant Smith speaking at a Sector meeting, discuss a "Be on the Lookout" report (BOLO Report) regarding "possible threats" and from the media about the quotas. Smith advised," Take that for what it's worth!" Smith immediately dismissed the Sector briefing early, after about 2 minutes. Normal briefings last about from 15 to 30 minutes. Other patrol officers in the briefing mentioned that it was abnormal, and that the BOLO Report was clearly related to Walker and Conklin's lawsuit filing.

108.    Thereafter, Sergeants Koch and Smith both ignored Conklin, even when he was clearly trying to speak to them about work related subjects.

109.    On March 20, 2022, at approximately 4:30pm, Lieutenant Holley emailed Conklin to cancel his "Police Training Officer interview feedback" meeting, that had been previously scheduled prior to the lawsuit being filed. On March 21, 2022, at approximately 10:36pm, Conklin emailed Lieutenant Holley to ask if the Police Training Officer feedback meeting would be rescheduled, but he never received a response from Holley.

110.    On March 22, 2022, at approximately 4:40pm, Conklin greeted Officer "PW," but Officer PW ignored Conklin completely. He acted as if Conklin was a ghost and not even occupying space.

**PLAINTIFFS' FIRST AMENDED FEDERAL COMPLAINT PETITION – Page 29 of 58**

111.    On March 22 and 23, 2022, Sergeant Balencia intentionally refused to acknowledge and/or greet Officer Conklin.

112.    On March 23 at approximately 4:45pm, Sergeant Balencia asked Plaintiff Walker to meet him after her call, and she obeyed, meeting him at his desk. Sergeant Balencia wanted to speak to her about 3 things:

a.    Balencia said Walker had made a mistake on a DWI blood sample impound by not "signing the seal." Walker let Balencia know that was not her impound or mistake-that it was another officer's mistake. Balencia appeared disappointed it was the fault of another officer and not Walker.

b.    Sergeant Balencia said he would was "made aware" of a robbery report Walker had completely on March 20, 2022, which report had already been approved by another Sergeant that same night (Sergeant Smith), where a "suspect description" line had been left out in the narrative. Despite photos and video being attached to the report, Balencia advised Walker that she needed to add that information in writing. Sergeant Balencia refused to state why he was reviewing a report outside of his chain of command, and he had just been made "aware" of this item.

c.    Sergeant Balencia asked Walker if she had any issues with her eyes. To which Walker responded in a confused manner, "like light issues?" He then advised Walker that she was not allowed to wear sunglasses in the briefing room as it is "rude" to do so. However, police officers wearing sunglasses inside at RPD briefing room is a standard practice, and other RPD officer remain free to do so despite Walker being banned from doing so by Balencia.

113.    On March 25, 2022, the City of Richardson appealing deceased Officer Allyson Niksich open records request to Texas Attorney General. Officer Allyson Niksich was a Richardson Police Officer, harassed relentlessly, eventually pushed out of the RPD, and she committed suicide.

114.    On March 27, 2022, the Command Staff mentioned that there were "threats" to RPD officers caused by "recent media" reports in a BOLO Report.

115.    This BOLO report was read to all officers at the daily sector meetings that start each shift and was effectively designed to place a wedge between Officers Walker and Conklin and the rest of the Department. This was done for a purpose, to cause more discord and retaliation, and bad feelings towards Walker and Conklin for breaking the Blue Wall of Silence by publicly exposing the RPD's unlawful ticket quotas. This conduct had the intended effect as one by one, officers who had supported Walker and Conklin's efforts to rid the RPD of the illegal ticket quota policy, have understood that Walker and Conklin are radiative and that any perceived friendliness with Walker and Conklin is detrimental to the other officers themselves.

116.    On March 28, 2022, Officer PW again refused to speak to Officers Walker and Conklin. Officer PW is in Officer Walker's individual sector, which meant he had to often respond to calls for service with Walker, especially. Thus, it was clear that Officer PW has Serpico-ed Walker and Conklin, and that Walker and Conklin could not count on Officer PW for backup in an emergency.

117.    On March 29, 2022, Sergeant Smith intentionally acted in a manner to communicate to Officer Walker that she was persona non grata, that she no longer existed as a police officer in the RPD, specifically, despite standing within feet of Walker, Smith repeatedly

acted like Walker was incapable of being heard by refusing to answer questions while she was on call, and while Smith was the superior officer covering Walker's activities.

118.    On March 30, 2022, Sergeant Kelly Pagel again mentions the alleged "threat" to RPD officers in a BOLO report during briefing.

119.    Upon information and belief, these continued BOLO reports were initiated and approved by each of the Individual Defendants, who form a key part of the Command Staff, and these BOLO reports were designed specifically to alienate the RPD Officer force from Walker and Conklin for the purpose of Serpico-ing Walker and Conklin.

120.    Later, Sergeant Pagel asked an RPD Officer to call her and explain details about a police call-for-service on which Walker had been the primary officer. Walker later asked this RPD Officer why Sergeant Pagel called the officer, instead of Walker, bypassing the primary officer when the primary officer is available. This was a major deviation from standard police practices. This behavior was designed and used as a form of retaliation toward Walker to let her know that she had been "Serpico-ed," that is she was no longer supported by command staff even while acting on calls to protect the citizens and residents of Richardson.

121.    On April 4, 2022, Officer Conklin was completely ignored by Sergeant Balenica in locker room. Any person observing the event would have immediately known that Conklin was considered a non-officer by Balenica and that he had been "Serpico-ed."

122.    On April 5, 2022, an RPD officer advised Walker that a male citizen had come up to them on a major crash the previous week and asked her if she knew "Kayla Walker" and that Walker had "saved her friend's life" the previous week. This RPD Officer said they gave the male the city number to give a commendation, but that the officer had not seen anything about it

on an "end of shift." This is another example of things that other Officers are recognized for, regularly, but not Officers like Walker or Conklin who have been "Serpico-ed" by Defendants.

123.    On April 5, 2022, at approximately 1:41am, Officer Walker greeted an RPD Officer AG, and this officer "Serpico-ed" her by refusing to respond. Walker was told by another Officer that Officer AG had indicated the officer was mad at Conklin and Walker for "doing what they are doing," which is an apparent reference to their conduct in speaking out regarding the RPD's unlawful quota policy.

124.    After this exchange with Officer AG, Walker started crying, due to the increasing amount of hostility and retaliation. Another Officer who observed Walker was crying then tried to comfort Walker, and this was witnessed by Sergeant Smith, who observed the other officer giving Walker a hug for moral support.

125.    Later at 3:35pm, Officer PW again refused to speak to Walker and Conklin. At the normal sector briefing, when Walker sat at the empty seat adjacent to Officer PW, Officer PW then moved from his normal seat in briefing to a seat across the room. This conduct of being Serpico-ed by PW was observed by another RPD officer who texted Walker that this incident had been seen observed and who then tried to encourage Walker regarding the harassment she was facing.

126.    Later that night, this officer communicated to Walker that they had engaged in a conversation with Sergeant Smith who asked why Walker was crying the night before, as he had also seen an officer trying to comfort Walker. The officer advised Smith that Walker was upset at the way coworkers had been treating her. Smith then advised them that Walker "kind of brought it on herself, she had to expect that." Smith also brought up that "someone" in briefing (he was not present) had told him that the officer had left the sector meeting early and asked if

this was done in an effort to show support for Walker, implying that it better not have been. The Officer was forced to explain that the officer's leaving the briefing had nothing to do with Walker, but that the agenda had been completed, and that and the officer simply did not want to listen to another officer non-agenda-item stories any longer when they could get to work.

127.   After April 5, Officer Walker was started crying almost on a daily basis at work due to the retaliation and ghosting she was suffering. One officer told Sergeant Smith that Walker was "upstairs upset." Smith did nothing.

128.   On April 7, 2022, at approximately 7:59pm, Sergeant Balencia called a "Sector meeting" at a time when Walker was not present. Walker was notified about this sector meeting by another RPD Officer who had noticed it was odd to not include Walker in her own sector meeting.

### H.   Having Been Serpico-ed, and in Fear for Their Safety While at Work, Plaintiffs Request the Protection of a Joint Assignment and Seek the Assistance of a Counselor, and Take Long-Term FMLA Leave When this Request is Denied

129.   On April 8, 2022, being unable to proceed to work without fear, anxiety or emotion overtaking her, Walker reached out to therapist about mental health, stress, and anxiety, due to this retaliation and harassment at work. Having been "ghosted" by her command staff, including each of the Individual Defendants and many of her fellow officers, without any correction from any of Defendants, Walker did not feel safe at work. Indeed, unlike a job crunching numbers in an office or driving a forklift in a warehouse, police officers are often forced to enter into a dangerous situation with the absolute need of knowing the other officers have their back. To the contrary, Walker was fully aware that the RPD Command Staff, including the Individual Defendants, had participated in the creation of communications designed to ostracize Walker and Conklin, and then allowed this ostracization to occur and grow

to the point that Walker and Conklin could not feel safe at work and were placed in unnecessary fear of danger just by being at work.

130.    Walker and Conklin then submitted a memo through chain of command asking to ride as a two-person unit due to the retaliation, ghosting, and clearly unsafe environment. Sergeant Smith advised Conklin by text message that the memo was received. The request was later denied by Lieutenant Holley and Captain Gerhart. The denial was later appealed by Conklin to Assistant Chief Bussiere and Chief Tittle. Conklin was informed on April 26, 2022 by email, from Assistant Chief Bussiere, that in consultation with Chief Tittle, the request was denied.

131.    On April 10, 2022, Walker was asked to stay after briefing to meet with Sergeant Smith and another RPD Officer. In the meeting, Smith admitted being "uncomfortable" with Walker. Smith stated that he was upset that the Officer who had comforted Walker had told Walker about the conversation between Smith and that officer, and Smith threatened to confront this Officer about it. Walker asked Smith not to confront this Officer, who was one of the only Officers left on the RPD that was not actively ghosting Officer Walker.

132.    This conversation made it clear to Walker that not only had she and Conklin been Serpico-ed, but that any RPD officer who offered any form of verbal, emotional or physical support to Walker or Conklin was also in danger of being Serpico-ed.

133.    Officer Walker could not hold back her tears during this meeting. After the meeting ended, Walker left the RPD headquarters building, and she has yet to return.

134.    On April 11, 2022, Officer Walker called in sick due to anxiety/stress of hostile work environment/retaliation. At 4:00 pm that day, Conklin observed Officer PW had moved back to his normal seat again, now that Walker was not present.

135.    On or about April 12, 2022, Conklin was advised Lieutenant Wolbrueck had written an internal memo specifically referencing Walker's complaints of hostile work environment, harassment, and retaliation, as well as Conklin's specific complaints of the same at the hands of Lieutenant Holley.

136.    On April 26, 2022, Walker was sent an email from Lieutenant Holley, essentially threatening that she would be fired if she didn't call in sick every day. This was despite the fact that Walker and Conklin had received permission from Sergeant Smith (by text message) that it was not necessary to call in to dispatch every day because each had advised they would not be returning that week due to work related stress and anxiety, which had been created through their lack of safety due to being Serpico-ed by Defendants. Conklin, who was on duty at that time, called Sergeant Balencia after receiving this information from Walker, and requested to go home immediately. Balencia hung up the phone rudely, on Conklin.

137.    On April 30, 2022, Walker received a call from an RPD Officer who was crying and advised Walker that Officer MJ, the treasurer of the RPD Police Union, had pulled the officer aside on behalf of the Union because the Union did not like that this officer had made a donation to Walker and Conklin's "go fund me" page. The Go Fund Me page had been established to provide for litigation expenses in this matter. Officer MJ advised this RPD officer that the officer's support for Walker and Conklin "reflected negatively" on the officer and the officer understood this to mean not only had Officers Walker and Conklin been "Serpico-ed" but that this the officer was no longer allowed to make any additional donations or actions to publicly support Walker or Conklin, and that if this officer did that they too would be Serpico-ed" in the same manner that Walker and Conklin had been ghosted.

138.     The above instances of Officers Walker and Conklin is just a short list of the instances of the Plaintiffs being "Serpico-ed" by the RPD, its Command Staff (including Individual Defendants), the RPD's Union, and individual officers.

139.     Each of the Individual Defendants has been made aware of such instances, including through the specific request by Officers Conklin and Walker to ride together so that they each could have at least one backup they could trust.

140.     Since the matter was filed on March 17, the above harassment has resulted in both Plaintiffs seeking the assistance of a mental health professional. This mental health professional has diagnosed that Officers Walker and Conklin qualify for Family and Medical Leave Act leave based on the fact that under the circumstances, which include how Walker and Conklin have been "Serpico-ed" and how such conduct creates symptoms when each is forced to report to duty and face the unnecessary risk of death, that is the risk of death above and beyond the normal risk of death associated with police work, because each has been denied the support of their department, department command staff (including Individual Defendants), the Police Union, and fellow officers.

141.     Accordingly, as of the date of this filing, Officers Conklin and Walker are on extended FMLA leave in which they were allowed to be paid for accrued vacation time, accrued sick time, and for donated leave time. Conklin's "paid" FMLA leave will expire within approximately six weeks and Walker's paid FMLA leave has expired. To remain on unpaid FMLA leave, each will have to recertify the medical conditions qualifying them for such status during the remaining time of each of their FMLA years.

142.     Therefore, as of the end of November, both Officers Walker and Conklin will be on unpaid FMLA leave (which leave is completely unpaid with the exception that each earn 10

hours of sick time and 10 hours of vacation pay per month while on "unpaid FMLA.") Each is eligible for a total of 12-months of FMLA leave under the RPD FMLA leave policy. Once this FMLA leave has expired, they will each be completely constructively discharged unless this Court acts sooner to prevent the harassment and retaliation that makes their return to work feasible under the Court's equitable powers.

143.    After starting FMLA leave, Plaintiffs have been informed by individuals within one of the non-sworn/civilian departments of the police department, that at a meeting of that department the civilian police employees were instructed that members of this department were not allowed to associate with Walker or Conklin. Specifically, members of this department were told that the command staff was watching and that "it reflects negatively" upon persons within this department who affiliate with Walker and Conklin.

144.    Accordingly, Plaintiff's assert that the harassment and treatment of Plaintiffs by Defendants has resulted in their being unlawfully harassed and/or constructively placed on unpaid leave, and that each will be constructively discharged when their unpaid leave expires, unless this Court acts to such dates by: (1) ruling that the RPD's Sector Averaging Policy, use of weekly Stat Sheets, use of average ticket writing as a basis for being rated on productivity, collectively or separately, are an illegal ticket quota under Texas Law; and (2) enjoins the use of such specific practices that form the "Serpico-ing" of Officers Walker and Conklin.

## IV.    LEGAL FOUNDATION

### A.    The First Amendment Protects Speech by Public Employees on Matters of Public Concern

145.    To prevail on a claim that a governmental employer has violated a governmental employee's right to free speech, the employee must establish that:

"(1) she/he spoke on a matter of public concern;

(2) their interest in that field outweighs the government's concern with the effective and efficient fulfillment of its responsibilities to the public;

(3) the speech caused the retaliation; and

(4) the adverse employment decision would not have occurred but for the speech."

*See, e.g., Fogarty v. Boles,* 121 F.3d 886, 888 (3rd Cir. 1997) (citing *Green v. Phila. Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997))."

146.   To prove a cause of action under 42 U.S.C. Section 1983, the plaintiff must establish:

1.   conduct by a "person;"
2.   who acted "under color of state law;"
3.   proximately causing; and
4.   a deprivation of a federally protected right.

147.   The First Amendment generally prohibits a public employer from disciplining, demoting, or firing an employee based on that employee's exercise of First Amendment rights, including speaking out on a matter of public concern or engaging in expressive conduct to the same effect, *see Fogarty*, 121 F.3d at 888, or associating with a particular political party, *see Goodman v. Pa. Turnpike*, 293 F.3d 655, 663–64 (3d Cir. 2002) (*citing Rutan v. Rep. Party of Ill.*, 497 U.S. 62, 75 (1990)).

148.   "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 215-16, 13 L.Ed2d 125 (1964)*. Accordingly, the U.S. Supreme Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values," and is entitled to special protection. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980). Speech by citizens on matters of public concern lies at the heart of the First

Amendment, which "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U. S. 476, 484 (1957).

149.     This principle remains true when speech concerns information related to or learned through public employment. After all, public employees do not renounce their citizenship when they accept employment, and the U.S. Supreme Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights. *See, e.g., Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 605 (1967); *Pickering*, 391 U. S., at 568; Connick v. Myers, 461 U. S. 138, 142 (1983).

150.     Further, the Supreme Court has also made clear that there is considerable value in encouraging, rather than inhibiting, speech by public employees because "[g]overnment employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill*, 511 U. S. 661, 674 (1994) (plurality opinion). "The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego v. Roe*, 543 U. S. 77, 82 (2004) (per curiam).

151.     Accordingly, First Amendment free speech rights of public employees can be raised in a variety of factual scenarios against their public employers. For example, the First Amendment protects employees for the following speech:

- An employee's complaints of sexual harassment by a Central official. *Azzaro v. County of Allegheny,* 110 F.3d 968, 978–81 (3d Cir.1997) (en banc);

- Manager's statements to media about lack of formal policies for assistance program available to police department employees; *Watters v. City of Philadelphia,* 55 F.3d 886, 893–94 (3d Cir.1995); and

- A state police employee's statements to media about retaliation she suffered because of her brother-in-law's court testimony against the state police. *Rode v. Dellarciprete,* 845 F.2d 1195, 1201–02 (3d Cir.1988).

### 1) It is Clearly Established in the Fifth Circuit that Public Employees Cannot Be Retaliated Against Based on Speech Regarding a Matter of Public Concern

152.    In this case, the speech in question pertaining to Walker and Conklin is detailed in the video of the April 19, 2021, City Council working session, the speech contained within the numerous Dallas Morning News Articles, and for both Walker and Conklin, the speech referenced within footnote 1 of City's alleged investigation.

153.    Prior case law clarifies that First Amendment speech to the public board that controls the employee's employment is protected by the First Amendment. *See, e.g., Czurlanis v. Albanese,* 721 F.2d 98, 104 (3d Cir.1983). Accordingly, speech by a county mechanic at county board meetings criticizing practices of the division of motor vehicles where he worked was protected by the First Amendment. *See. Id.*

154.    Further, if the speech is invited by the governmental entity, the invitation to speak has repeatedly been held by the Fifth Circuit as favoring a finding that the invited speech is protected by the First Amendment. *See e.g., Salge v. Edna I.S.D.*, 411 F.3d 178, 189 (5th Cir. 2005), citing *Harris v. Victoria I.S.D.,* 168 F.3d 216, 222 (5th Cir.1999); *Victor v. McElveen*, citing *Bickel v. Burkhart,* 632 F.2d 1251, 1257 (5th Cir.1980); *Warnock v. Pecos County,* 116 F.3d 776, 781 (5th Cir.1997).

155.    Further, that Walker and Conklin have a tangential interest in their employer being run properly does not transmogrify their public speech into a purely private concern. *See, e.g., Wetherbe v. Texas Tech University Sys.*, 699 Fed.Appx. 297, 300 (5th Cir. 2017) (speech focused on the tenure system and not the employee's personal job is over a matter of public concern); *citing inter alia, Salge*, 411 F.3d at 190 (finding that the content of an employee's speech weighed "in

favor of holding that she spoke on a matter of public concern" when she spoke about a matter unrelated to her own employment status or job performance), and *Moore v. Kilgore*, 877 F.2d 364, 370–72 (5th Cir. 1989) (firefighter's thoughts about staffing shortage, which might threaten the fire department's ability to perform its duties, constituted speech on a matter of public concern).

156.    "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." Charles v. Grief, 522 F.3d 508, 514 (5th Cir. 2008) (citation and quotation marks omitted). Speech may contain elements of both personal and public concern and nevertheless be found to address public concern. *Salge v. Edna I.S.D.*, 411 F.3d 178, 186 (5th Cir. 2005). Accordingly, in this Complaint, Plaintiffs have pleaded the content, form, and context of each of their communications are protected by the First Amendment.

### 2)    The Fifth Circuit Routinely Denies Qualified Immunity When a Public Employee Claims to Have Suffered Retaliation Due to Protected Speech.

157.    Defendants may likely plead the doctrine of qualified immunity, and this pleading is an attempt to respond to that affirmative defense.

158.    The doctrine of qualified immunity immunizes government officials acting within their discretionary authority from civil damages if their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.,* 380 F.3d 872, 879 (5th Cir.2004).

159.    This doctrine is well litigated, as it has long been the rule that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See, e.g., Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 376-77 (2000), citing, *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct.

2727, 73 L.Ed.2d 396 (1982); and *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1699,143 L.Ed.2d 818 (1999).

160.    The qualified immunity determination is a two-step inquiry. First, the court must decide whether a plaintiff's allegations, if true, establish a violation of a clearly established right. *Id. Kennedy*, 224 F.3d at 377, citing, *Fontenot v. Cormier,* 56 F.3d 669, 673 (5th Cir.1995); *see also Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Second, if the plaintiff has alleged a violation, the court must then decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident. *Id; see also*, *Fontenot v. Cormier,* 56 F.3d 669, 673 (5th Cir.1995) and  *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), *Kennedy*, 224 F.3d at 377, citing, *Siegert,* 500 U.S. at 231–32, 111 S.Ct. 1789, *and Kelly v. Foti,* 77 F.3d 819, 821 (5th Cir.1996).

161.    In regard to the first element of review, the Fifth Circuit has been addressing claims of alleged wrongful termination in violation of the First Amendment and Section 1983 for decades and have repeatedly held that firing an employee because of the employee's speech on a matter of public concern violates the First Amendment right to free speech.

      a.    For example, in 1992, the Fifth Circuit held that public employees' speech reporting official misconduct, wrongdoing, or malfeasance on the part of public employees involves matters of public concern. *Wilson v. UT Health Center,* 973 F.2d 1263, 1269 (5th Cir. 1992) (reporting sexual harassment by superiors).

      b.    Likewise, in 1994, the Fifth Circuit held that reporting suspected criminal activity of city council member was protected public speech under the First Amendment. *Schultea v. Wood,* 27 F.3d 1112, 1119–20 (5th Cir. 1994), *superseded on other grounds,* 47 F.3d 1427 (1995) (en banc).

c. In 1988, the Fifth Circuit held that a police officer's communication in his attorney's letter accusing the police department of noncriminal investigations of journalists, citizens, and candidates for city council addressed matters of public concern. *Brawner v. City of Richardson,* 855 F.2d 187, 191 (5th Cir. 1988).

d. In September of 1991 and January of 1992, when juvenile probation officers were fired by a school district for "going over its heads" to report perceived wrongdoing by the district to the state education agency, the Fifth Circuit held that the officers had a constitutional right to address that matter of public concern. "[S]peech reporting official misconduct, wrongdoing, or malfeasance on the part of public officials involves matters of public concern." *Denton,* 136 F.3d at 1038 -1043, citing *Wilson,* 973 F.2d at 1269; *Schultea,* 27 F.3d at 1120; *Brawner,* 855 F.2d at 192).

162.    Further, given this longstanding law, in regard to the second element of review, the Fifth Circuit has repeatedly held that it is clearly established that a governmental employer is acting unreasonably and "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). For example, almost 20 years ago in *Branton v. City of Dallas*, 272 F.3d 731, 745-46 (5ᵗʰ Cir. 2001), the Fifth Circuit summarized its prior cases related to First Amendment Free Speech by a governmental employee, and held that the right to free speech by an employee regarding a matter of public concern was clearly established:

> In *Warnock v. Pecos County, Texas,* 116 F.3d 776, 781–82 (5th Cir.1997), we held that state judges' decision not to reappoint the county auditor violated the First Amendment, that the relevant First Amendment law was clearly established when the judges made their decision in 1993, and that firing a county auditor for reporting violations of the law is objectively unreasonable. And, in *Frazier v. King,* 873 F.2d 820, 827 (5th Cir.1989), we denied qualified immunity to the warden of a state

correctional center who fired a registered nurse in violation of her clearly established right to report violations of nursing practices in the infirmary. *See also Thompson,* 901 F.2d at 468–70 (denying qualified immunity to police officials who terminated a police officer for filing written grievances related to the department's promotion policy and for making oral complaints about police misbehavior); *Harris,* 168 F.3d at 223–24 (denying qualified immunity to school superintendent for reprimanding two teachers who made critical remarks in 1995 about the school's principal and stating that "[t]he Defendants are not insulated from their unconstitutional conduct merely because a balancing test is involved in our [First Amendment] analysis"); 2 Ivan E. Bodensteiner & Rosalie Berger Levinson, State & Local Government Civil Rights Liability § 1A:05 n. 88 (2000) (citing cases from all circuits).

163.    Indeed, as the Fifth Circuit ruled over 20 years ago, "it was well settled that public employees could not be fired for exercising their first amendment rights, even when such speech took place in a private forum." *See, Thompson v. City of Starkville,* 901 F.2d 456, 470 (1990), citing *Givhan,* 439 U.S. at 410, 99 S.Ct. at 693 (court found that teacher's speech concerning racial discrimination warranted first amendment protection, even though it was communicated privately to the school principal).

164.    Moreover, Walker's and Conklin's speech was protected because neither was speaking as an employee bringing a personal grievance, rather each was speaking outside of her or his ordinary job duties and instead was discussing a topic of public concern – illegal ticket quotas. *See, e.g., Lane v. Franks*, 573 U.S. 228, 238-239 (2014), clarifying *Garcetti v. Ceballas*, 547 U.S. 410, 424 (2006) (although limiting protected Free Speech to items occurs outside of one's ordinary job duties, but rejecting the "suggestion that employers can restrict employees' rights by creating excessively broad job descriptions"). Indeed, in applying the *Garcetti* opinion, the Fifth Circuit has held that the mere fact that the employee seeking First Amendment protection gained the knowledge through their work is not dispositive. *See, e.g., Chares v. Grief*, 522 F.3d 508, 513 (5th Cir. 2008), and *Anderson v. Valdez*, 845 F3d 580, (holding that speech was not made pursuant to official duties is protected and that "statements by public officials on matters of public concern

must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors.").

165.    In cases asserting retaliation under the First amendment, liability applies to more than just the final decisionmaker, and it includes all individuals acting in conjunction with the final decisionmakers based on principles of causation. *See Sims v. City of Madisonville*, 894 F.3d 632, 640-41 (5th Cir. 2018) (clarifying prior cases, reversing the holding in *Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004), which limited liability to the final decisionmaker, and making it settled law that all persons who are responsible under tort causation principles as detailed in *Jett v. Dallas I.S.D.*, 798 F.2d 748, 758 (5th Cir. 1986) are liable under Section 1983 for First Amendment free speech violations).

166.    In this matter, both Walker and Conklin have engaged in protected speech, and the City and Police leadership were fully aware of that speech. Walker has engaged in such speech directly to the Richardson City Council, to the Dallas Morning News, and also to the media sources noted in footnote one of the alleged Investigation. Conklin's speech was made to media and was also noted in footnote one of the City's alleged investigation of the illegal ticket quota.

167.    As such, the Individual Defendants are not protected by qualified immunity.

**B.      The Texas Whistleblower Act**

168.    The Texas Whistleblower Act (TWA) is codified in Chapter 554 of the Texas Government Code. The TWA at Sections 554.002 (a)-(b) (1) (2) state:

> (a)      A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.
> (b)      In this section, a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:

(1)      Regulate under or enforce the law alleged to be violated in the report; or

(2)      Investigate or prosecute a violation of criminal law.

169.    Pursuant to Sections 554.002(a), a plaintiff may recover of actual damages, including lost wages and benefits in the past, court costs and reasonable attorney's fees. Damages under this section are not subject to any caps.

170.    Pursuant to Section 554.003(b), a plaintiff is entitled to equitable reinstatement to his former position or equivalent position; provided however, if the Court determines through the exercise of its equitable powers that reinstatement is not feasible under the circumstances, then the Court may award the alternative equitable remedy of front pay for future lost wages and benefits. Damages under this section are not subject to any caps.

171.    Pursuant to Section 554.003(c), Plaintiff is also entitled to recover compensatory damages for future pecuniary losses (that are not front pay or benefits), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses. Damages under this section are subject to caps as described in Section 554.003(c) (1-4), as appropriate. However, these damages caps are unconstitutional and violate the Texas Constitution's prohibition on Special Laws for two reasons: (a) the damages caps are unreasonable because they are not indexed for inflation; and (b) the damages caps are unreasonable because there is no reasonable basis to give some governmental employees injured by whistleblowing retaliation full recovery and other such employees only partial recovery; thus the TWA's caps are arbitrary and fail to operate equally on all employees within the class of persons injured by a violation of the Texas Whistleblower Act.

C.   **Walker and Conklin Both Suffered Adverse Employment Actions, Including by Harassment, the Requirement for Unpaid FMLA Leave, and Their Impending Constructive Discharge**

172.   In a First Amendment case, "[t]o constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind." *Coszalter v. City of Salem,* 320 F.3d 968, 975 (9th Cir.2003). There are a variety of means to show that retaliation was a substantial or motivating factor behind an adverse employment action, including:

(1) introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech;

(2) introduce evidence that the employer expressed opposition to the speech; or

(3) introduce evidence that the proffered explanations for the adverse action were false and pretextual.

*Id.* at 977.

173.   An adverse personnel action in a TWA case is one that "would be likely to dissuade a reasonable, similarly situated worker from making a report under the Act." *See Montgomery County v. Park,* 246 S.W.3d 610, 614 (Tex. 2007). The Supreme Court has explained that this objective materiality standard, which is derived from federal employment law, allows claims based on retaliatory actions "likely to deter" reporting of governmental violations of law while weeding out "petty slights" and "minor annoyances." *Id.* The standard also bars trivial claims resulting from a plaintiff's unusual subjective feelings, while allowing claims arising from the particular circumstances of the challenged action. *Id.* at 614–15.

174.   Nonexclusive factors to consider in determining materiality include whether the allegedly adverse personnel action negatively affected the employee's (1) prestige; (2) opportunity for advancement; (3) working conditions; (4) pay or income; or (5) ability to obtain outside

employment. *Id.* at 615. The presence or absence of any of these factors is not dispositive. *Id.* The effects of a challenged action must be considered as a whole and in light of all the circumstances, and an act that would be immaterial in some situations is material in others. *Id.*

175.    Further, it has long been held that the TWA should be interpreted in congruence with other employment law statutes. *See Montgomery County v. Park*, 246 S.W.3d. 610, 614-15 (Tex. 2007) (holding "[t]he anti-retaliation provision of Title VII and the Whistleblower Act serve similar purposes," and adopting U.S. Supreme Court's *Burlington* standard for determining "adverse employment actions" in Title VII cases for determining the question of "adverse personnel actions" in TWA cases).

176.    Although a lower annual evaluation is not always an adverse employment action, it is in this case. Indeed, Walker's lower annual evaluation has an immediate and detrimental impact on her (1) prestige; (2) opportunity for advancement; and (3) working conditions, and because of the department's requirements for prior declining evaluations, this lower annual evaluation sets her up for immediate termination next year.

177.    Accordingly, in the right case, a negative evaluation is an adverse employment event that can support a Texas Whistleblower Act claim. *See, e.g., Bonillas v. Harlandale ISD*, 832 F.Supp.2d 729, 739-41 (W.D. Tex. 2011) (finding negative evaluation to be an adverse employment event under both TWA and First Amendment).

178.    Further, failure to promote has long been recognized as an adverse employment event which has been described by the Supreme Court as any event that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141

L.Ed.2d 633 (1998) (citations omitted); *see also, Pierce v. Texas Department of Crim. Justice, Inst. Div.,* 37 F.3d 1146, 1149 (5th Cir.1994) (citing *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994)). *See also Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir.1997).

179.    Finally, a pattern of harassment designed to chill free speech of an employee has been recognized as an adverse employment event. *See Colsom v. Grohman*, 174 F.3d 498, 513-14 (5th Cir. 1999), citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable."). Although the Fifth Circuit in the *Colsom* case failed to find that harassment constituted an adverse employment event, in this case, Walker's immense personal distress makes this harassment actionable. Indeed, an employer's activities may be deemed to amount to a constructive discharge only if "the employer made conditions so intolerable that the employee reasonably felt compelled to resign." *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983); *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985). In a case of such harassment sufficient to create a constructive discharge, it would be hard to imagine the employee has not suffered an adverse employment event merely because she or he is a tough-as-nails cop who is toughing out the harassment.

   **D.    The Use of Mandamus and/or the Declaratory Judgment Act is Permissible to Stop Ultra Vires Actions of Government Employees**

180.    The Texas Supreme Court has acknowledged, though, that "an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars.' "*City of El Paso v. Heinrich,* 284 S.W.3d 366, 372 (Tex.2009) (citing *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997)). The high court elaborated that "suits to require state officials to comply with statutory

or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money." *City of El Paso,* 284 S.W.3d at 372.

181.     These actions can lie as an independent Mandamus or under the Declaratory Judgment Act. For example, in *City of Seven Points v. Anderson*, 834 S.W.2d 519 (Tex.App—Tyler 1992), the action was founded upon a direct mandamus of a governmental official. "Awrit of mandamus will issue to compel a public official to perform a ministerial act." *Anderson v. Seven Points,* 806 S.W.2d 791, 793 (Tex.1991). "An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Id.* However, similar relief is available under the Declaratory Judgment Act, such as *in City of El Paso v. Heinrich*, the action was based on the Declaratory Judgment Act. *See,* 284 S.W.3d 366. Using either foundation, it is clear that governmental employees may not injure others while acting in an ultra vires manner that is contrary to the law and that this Court may both interpret the Texas Transportation Code at Section 720.002 and enjoin the Individual Defendants from violating Section 720.002.

182.     The Uniform Declaratory Judgment Act "is a remedial statute designed 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" *City of El Paso,* 284 S.W.3d at 370 (citing Tex. Civ. Prac. & Rem.Code Ann. § 37.002(b) (West 2008)). It provides as follows:

> A person ... whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Tex. Civ. Prac. & Rem.Code Ann. § 37.004 (West 2008).

183.     While the doctrine of sovereign immunity originated to protect the public from unforeseen expenditures that could hamper governmental functions, *see Tex. Natural Res.*

*Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 854 (Tex.2002), it has been used to shield the state from lawsuits seeking other forms of relief, *see, e.g., W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 839 (1958) ("[T]he rule of state immunity from suit without its consent applies to suits under the Uniform Declaratory Judgments Act...."). Concomitant to this rule, however, is the *ultra vires* exception, under which claims may be brought against a state official for nondiscretionary acts unauthorized by law. *See, e.g., Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 404 (Tex.1997). Such lawsuits are not against the state and thus are not barred by sovereign immunity. *Id.*

184.    Accordingly, "private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority." *See IT–Davy,* 74 S.W.3d at 855 (using enforcing provision in the Teas Water Code through Declaratory Judgment Act); see also, *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432 (Tex.1994) (declaratory judgment act suit challenging state officials' construction of compulsory school-attendance law); and *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 838 (1958) (suit against state official for wrongfully imposing a statutory tax burden). "This is because suits to compel state officers to act within their official capacity do not attempt to subject the State to liability." *See IT–Davy,* 74 S.W.3d at 855 "Therefore, certain declaratory-judgment actions against state officials do not implicate the sovereign-immunity doctrine." *Id.*

185.    The Texas Transportation Code at Section 720.002, states as follows:

(a) A political subdivision or an agency of this state may not establish or maintain, **formally or informally**, a plan to evaluate, promote, compensate, or discipline:

> (1) a peace officer according to the officer's issuance of a predetermined or specified number of any type or combination of types of traffic citations; ….

(b) A political subdivision or an agency of this state may **not require or suggest** to a peace officer, …:

(1) that the peace officer is required or expected to issue a predetermined or specified number of any type or combination of types of traffic citations within a specified period; ….

(emphasis added) …

(e) A violation of this section by an elected official is misconduct and a ground for removal from office. A violation of this section by a person who is not an elected official is a ground for removal from the person's position.

186.     Despite the restrictions of Section 720.002, for the duration of Walker's and Conklin's long careers at the Richardson Police Department, the City has maintained a *de facto* ticket quota system by routinely requiring or suggesting to officers for them to increase their ticket writing up to "average" and by specifically supplying the number needed to reach average when doing so.

187.     Chief Tittle is aware that this policy exists and allows it to continue. The policy is enforced by Defendants Gerhart, Holley, Fitzsimmons, and Sweire.

188.     Although Chief Tittle is formally stating to the public that there is no such policy, he is allowing the policy to continue by: (1) failing to clearly articulate that the use of ticket averages and/or requiring officers to come up to average violates Texas' prohibition on ticket quotas in Section 720.002, his claims to have prohibited any prior ticket quota fail to do so; (2) by allowing his Captains, Lieutenants, and Sergeants to continue to use ticket averages as a grounds for discipline; and (3) by continuing to allow his subordinate command staff, including Defendants, to issue weekly Stat Sheets so that RPD officers know whether or not they are behind their current sector average.

189.     Further, for years when Peace officers have been below average, their supervisors and training officers have formally or informally instigated plans to evaluate officers based on the

number of traffic tickets written and have actually used said evaluation systems to retaliate against officers who did not improve to average.

## V.     CAUSES OF ACTION:

### A.     Count One: by Both Plaintiffs, Against the Individual Defendants, Under 42 U.S.C. Section 1983 for Unlawful Retaliation in Violation of the First Amendment of the United States Constitution

190.     For the first cause of action, Plaintiffs Walker and Conklin would show that the individual Defendants violated Plaintiffs' First Amendment rights by retaliating against Plaintiffs based on their protected speech resulting in Plaintiff Conklin's failure to be promoted and Plaintiff Walker's negative evaluation and harassment. This action is brought against the individual Defendants, acting under the color of law in their individual capacity.

191.     As a result of the Defendants' wrongful conduct, Plaintiff has suffered damages recoverable under, and/or is eligible for equitable relief under the First amendment and 42 U.S.C. Section 1983, including the promotion of Plaintiff Conklin to Training Officer and Acting Sergeant, the removal or Plaintiff Walker's negative evaluation, an injunction stopping future harassment of Plaintiffs Walker and Conklin, and compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other past and future nonpecuniary losses.

### B.     Count Two: Retaliation in Violation of the Texas Whistleblower Act by Plaintiff Walker Against Defendant City of Richardson

192.     For the second cause of action, Plaintiff Walker would show that the City retaliated against Walker in violation of the Texas Whistleblower Act through her harassment and negative evaluation. This occurred because Walker in good faith reported a violation of law by the City and other public employees to one or more an appropriate law enforcement authority. As a result of the City's wrongful conduct, Plaintiff has suffered damages recoverable under, and/or is eligible

for equitable relief authorized by, the TWA at Sections 554.003(a-c), including removal or her negative evaluation, an injunction stopping future harassment, and compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other past and future nonpecuniary losses.

    **C.    Count Three: By Both Plaintiffs Against the Individual Defendants Requesting Equitable Relief against the Individual Defendants Either Via Mandamus and/or under the Declaratory Judgment Act**

    193.    For the third cause of action, Plaintiffs Walker and Conklin seek injunctive relief in the form of a declaratory judgment declaring that the average citation policy enforced by the Individual Defendants violates the Texas Transportation Code at Section 720.002, and a permanent injunction requiring the individual Defendants to obey Section 720.002 and implement policies and procedures to end illegal ticket quotas. Plaintiffs specifically seek either a Mandamus or declaratory judgment that includes, *inter alia*:

        a.    The use of Sector Averaging, that is judging an officer's productivity and/or performance rating based on the number of tickets written or warnings written against other officers in his or her sector, and constitutes an unlawful ticket quota policy that violates Section 720.002;

        b.    The use of Weekly Stat Sheets that list each officer's number of traffic stops, tickets, and warnings, and that is published to all officers in a sector was and is an unlawful tool used to violate Section 720.002;

        c.    The use of the number of tickets written by an officer, independently or in comparison to other officers in his or her sector, or the department as a whole or any sub-section of the Department, as a basis for discipline, reprimands, and annual review scores and/or ranking violates Section 720.002;

d.  That enters an injunction barring the future use of Sector Averaging, bars the use of the current Weekly Stat Sheets or any similar document that advises officers of other officer's ticket counts; and using the number of tickets written by a police officer, independently or in comparison to other police officers in his or her sector or against the Department as a whole or any subsection of it.

## V.   PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiffs have and recover Judgment against Defendant with the following relief, which is pleaded alternatively or additionally:

(1)  A determination that the Individual Defendants each violated the First Amendment speech rights of Officers Conklin and Walker by one or more individual actions alleged above;

(2)  A determination that the City of Richardson wrongfully retaliated against Plaintiff Kayla Waler in violation of the Texas Whistleblower Act;

(3)  A determination in the Court's equitable power of Mandamus and/or under the Declaratory Judgment Act finding that the Sector Averaging citation policy, the use of Weekly Stat Sheets, the use of an officer being above or below average as compared to other officers in their Sector, the Department as a whole or another division, as applied to traffic citations and implemented by the Individual Defendants violates the Texas Transportation Code at Section 720.002;

(4)  A permanent injunction orders the individual Defendants:
(a) to promote Officer Conklin to the positions to which he was wrongly denied: Acting Sergeant and Training Officer,
(b) that removes the negative evaluation from Officer Walker's record and replaces it with one that properly assesses her work in a non-retaliatory manner,
(c) that halts all harassment against Officer Walker and Conklin and instructs the Individual Defendants shall take other specific action ordered by the Court to ensure the harassment and retaliation against cease; and
(d) that instructs the Individual Defendants to obey Section 720.002, as interpreted by the Court, and impose policies and procedures that require their subordinates to do so as well, including ceasing he use of any Sector Averaging Policy, ceasing the use of Stat Sheets that advise officers the

number of tickets other officers have written; and/or the use of the number of tickets an officer has written compared to other officers when evaluating an officers productivity or otherwise evaluating, disciplining, or promoting police officers;

(5) Back Pay damages; reinstatement damages, if feasible, and if not found feasible in the Court's equitable power, front pay; Compensatory damages under the First Amendment and/or the Texas Whistleblower Act, including damages for past and future mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life, emotional distress, physical distress, and other nonpecuniary losses;

(6) Prejudgment and post-judgment interest at the maximum legal rate;

(7) Costs of Court;

(8) Attorneys' fees; and

(9) All such other and further relief in law or equity to which Plaintiff may be justly entitled.


Respectfully submitted,

/s/ Eric N. Roberson

_____
Eric N. Roberson
State Bar No. 00792803
ENR@kilgorelaw.com
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75204
(214) 379-0817
(214) 379-0843 (telecopy)
**ATTORNEY FOR PLAINTIFFS**
**KAYLA WALKER AND DAVID CONKLIN**

## CERTIFICATE OF SERVICE

The undersigned certifies that this filing is served upon all counsel of record simultaneously with filing under the Court's Pacer/ECF system.

*/s/ Eric N. Roberson*

_____

Eric N. Roberson